First case this morning is 5-24-0354, Mitchell-Roberts Partnership, et al. v. Williamson Energy. Arguing for the opponents is Stephen Wallace and Seth Uphoff. My understanding is you're dividing your time? That's correct. All right. And arguing for the appellee is Joshua Hammock. That's correct. All right. And you're going solo today? I am. All right. We've read your briefs. This is a complicated case, but I think we're familiar with the facts in the briefs, so if you want to jump directly to your argument, you may proceed when you're ready. I will, Your Honor. May it please the Court, Counsel. Steve Wallace for the counterclaim defendants, Mitchell-Roberts Partnership, et al. I will be addressing the issues of standing as well as judicial estoppel, Your Honor. And those revolve around the bankruptcy case filed by Williamson Energy and a number of its affiliated debtors. Your Honors, information is the lifeblood of a bankruptcy case. It's incumbent upon a debtor seeking relief under the Bankruptcy Code to make full disclosure of assets and liabilities and financial affairs. The debtor in a bankruptcy case is seeking a benefit, and that is in the form of a discharge, meaning pre-bankruptcy debts are eliminated, but there's a price to pay. That price is complete disclosure. Absent complete disclosure, creditors and parties in interest in the bankruptcy case have no frame of reference in which to evaluate the posture they want to take in that bankruptcy case. Section 521 of the Bankruptcy Code is clear. Absent bankruptcy court relief, to the contrary, it's incumbent upon a debtor in bankruptcy, such as Williamson Energy here, to disclose all its assets and all its liabilities. There is an asset that is an issue here today, and that is the counterclaim it pursued against Mitchell-Roberts partnership at all. That counterclaim appears nowhere, nowhere in the debtor's bankruptcy schedules, in Williamson's bankruptcy schedules. Nowhere. Williamson filed its bankruptcy case in March of 2020. In June of 2020, the plan was confirmed. Upon confirmation of that plan, Williamson Energy received a discharge, meaning its pre-bankruptcy debts were gone. Its remaining debts were those that were embodied in its plan of reorganization. Didn't they have kind of a catch-all phrase in the bankruptcy that might be stretched to say that included the counterclaim, or is that too vague? It's too vague, Your Honor, number one. Williamson has done something that is completely inappropriate. It has conflated the obligation to schedule assets and liabilities under Section 521 of the Bankruptcy Code with its disclosures in connection with the plan of reorganization. Section 521 governs assets scheduled with assets and liabilities. Section 1125 of the Bankruptcy Code governs disclosure. That presumes, the preservation of rights in a disclosure statement presumes that the debtor has made complete disclosure in the schedules. May I read that? As a creditor, wouldn't your client have had a right to object to the schedule and raise that issue of bankruptcy? Well, we might have, but what about the entire creditor body? This is about whether or not the creditors as a whole have a right to do that. Sure, we did, but why couldn't we rest on the assumption that they're asserting nothing? If I may read from the schedules they filed. In the ordinary course of their business, and this concerns Schedule A, B, which are the schedules of assets and liabilities. In the ordinary course of their businesses, the debtors may have accrued or may subsequently accrue certain rights to counterclaims, cross-claims, set-offs, credits, rebates, or refunds with their customers and suppliers or potential warranty claims against their suppliers. Additionally, certain of the debtors may be party to pending litigation in which such debtor has asserted or may assert claims as a plaintiff or counterclaims and or cross-claims as defendant. This is the important part. Because such claims are unknown to the debtors and not quantifiable as of the petition date, they are not listed on Schedule A, B, Part 11. And that's where causes of action are required to be identified. I'll be honest. Is that where the record you're reading from? It's an exhibit to the Boyko Deposition. I don't have the page number, Your Honor, but it's Exhibit 2 to the Alan Boyko Deposition. And that is the Williamson Schedule of Assets and Liabilities. I'll be darned if I can understand how they can state in their bankruptcy schedules in March or April of 2020 that they don't know and can't quantify any cause of action when this counterclaim was pending since 2016. Your Honor, absent scheduling of assets, it's clear under the case law, and I'm citing also the Supreme Court's decision in Denver, as well as the decision issued last week by the First District Appellate Court, Cologne, absent disclosure, once a debtor obtains relief in a bankruptcy case, the assets don't typically reinvest in the debtor post-confirmation of a plan unless they're not scheduled. In that instance, they remain property of the bankruptcy estate, and the debtor doesn't have standing. The asset remains property of the bankruptcy estate. That's number one, as to standing. Since the assets didn't reinvest, Williamson Energy can't be prosecuting this cause of action. It has to be prosecuted by the bankruptcy estate, and that's not going on here. Number two, that's to standing. Judicial stopper, there's a five... It says your time is up. Are you going to split that? How are you splitting that? We're splitting it five and ten, Your Honor. I think my time may be up. Before you sit down, though, let me ask a question. Maybe the clock's not running for this. There's some dispute about what standard of review is. My understanding is the trial court did not hold a hearing on a fee petition, and so, therefore, with regard to that issue, the standard is manifest way to the evidence. Are you speaking to that, or is that your co-counsel? My co-counsel will handle that, Your Honor. Okay. In my instance, the question of standing is a question of law, which you can review de novo. Okay. The question of judicial stopper is a question of abuse of discretion, which you can also review de novo. I submit, as we set forth in our briefs, that the five standards or the five elements of judicial stopper are met here, and the provision that I just read to you from the schedules that Williams & Energy filed demonstrates intent to deceive, because they affirmatively state, we don't know if we have any such causes of action. This had been pending since 2016. How in the world can they make that assertion in a bankruptcy schedule when the cause of action had been pending? Moreover, counsel who's here today and represented Williamson in the state court, in the lower court, was counsel in the bankruptcy case. The amount they're seeking here, the amount sought here, which is roughly $3.9 million, outstrips by over a million dollars that was to be paid to unsecured creditors across all of the affiliated entities. So, Your Honor, I don't want to cut you off too much. If there's any time left, we've got to divide this up how you guys want to divide it. Mr. Althoff will shoot me if I don't shut up, Your Honor. In a complicated case, I could listen to it probably all day. If there's enough record, we should listen to it all day. But we have four arguments at this point, so we need to kind of use that time. Understood. May it please the Court, counsel, my name is Seth Althoff here. On behalf of the appellants, I'll be trying to address the remainder of the arguments in the time remaining. I'll jump right into it. One of the first significant issues on appeal is the fact that the Mitchell-Roberts partnership did not own Parcel 68. Parcel 68 is at the heart of this litigation and this part of the counterclaim, and the partnership did not own that after 1939. In 1939, there was an agreement that was recorded with the Court that expressly excluded Parcel 68 from the partnership's assets. Therefore, in 2010, when the Keys were signing mitigation agreements, they could not have been signing those on behalf of the partnership because it didn't relate to a partnership asset, and therefore those mitigation areas. Counsel, what about this idea that there were judicial admissions, though, in documents where there was claims of owning? How do you address that? Ownership is a legal determination. It's not a factual conclusion. It's not a factual admission. So I can claim that I own the land that this building sits on. I can do it under oath. It doesn't mean that it's true. It doesn't mean that it's legally binding and accurate. So legal conclusions such as determining property ownership cannot be subject to judicial admission, especially based on statements by parties who are unsophisticated at best. So in this particular situation, the documents, the legal documents that determine chain of title, dictate and demonstrate that Parcel 68 was not owned by the partnership at the time the Keys were signing those agreements, and therefore they could not be bound by those. Similarly, they were signing the releases at the same time in the same context, not in relation to Parcel 68, or excuse me, in relation to Parcel 68, which was not owned by the partnership. And because releases have to be strictly construed, if you look at those release documents, they apply only to the Keys, and they more specifically apply only to those legal descriptions of Parcel 68. Those releases do not extend beyond that particular parcel, and that parcel was not owned by the partnership at the time those releases were executed. Additionally, the Court was incorrect in essentially ruling that the New Surface Clause allowed the Williamson Energy to attach the releases to all of the partnership assets in other areas. The New Surface Clause is a portion of paragraph 11 of the mitigation agreements, and it seeks to try to extend those mitigation agreements to future acquired property. And that New Surface Clause is inoperable for several reasons. The first is that it's contained within the mitigation agreements, which are unconscionable. We brief this in detail, but if you look at the attendance circumstances and all the facts surrounding the signing of these mitigation agreements, it demonstrates both procedural and substantive unconscionability. And I won't go into all of those, but suffice to say we've got unsophisticated surface owners who were dealing with a very sophisticated, large corporation with counsel available to them. The testimony in the depositions and the affidavits from those surface owners were that they were under duress, that they felt compelled, they had to sign those, they didn't have time to review them, they didn't fully understand them. Some of them didn't understand until years, years later, when they were being deposed, that these documents essentially conveyed away, at least according to the Williamson Energy, conveyed away legal rights that they had in relation to the ownership of their property. They had no idea about any of that. So these were unsophisticated individuals, and I don't mean that insultingly, but just in a legal sense, and they were dealing with a very large company who had legal counsel available to them. And the way those documents was drafted was, I would argue, designed to be deceptive. The documents would lead any surface owner to think that all it was dealing with was subsidence damage to the structures on the surface of their property. It wasn't until there were some deceptive changes made in large boilerplate paragraphs that it changed the entire context of those mitigation agreements to essentially relieve Williamson County of all liability. And that waiver of liability didn't have any highlighting to it, it wasn't set off in bold, it wasn't brought to the attention of those surface owners, and so we would argue that that's another factor in the unconscionability determination. And when you look at even just the new surface clause in and of itself, that's also unconscionable because it pretends to take this document and agreement and apply it to potentially thousands of acres in the future with no additional compensation. That on its face, I would argue, is unconscionable. Additionally, the new surface clause is inoperable because it's not a proper deed. You don't know who the parties are going to be in the future for this new acquired property. You could argue it's the Keys, but Williamson argument, Williamson Energy argues that it could be anybody acting on the Keys' behalf or for the Keys' benefit. So you don't know who those parties could be in the future that would be party to this supposed deed. Additionally, there's no legal description, it's just some unknown property in the future. You don't know what county it's in, you don't know when it's going to be executed, and there's no evidence of any compensation for that. So how can that be an effective quitclaim deed? I would argue it cannot be, and therefore the new surface clause is inoperable in that sense. Additionally, the new surface clause is inoperable because the Mitchell-Roberts partnership doesn't own surface. The new surface clause only applies to new surface land or new surface property, but the Mitchell-Roberts partnership has only ever claimed mineral rights, coal above 125 feet, oil and gas. Those are the rights that they have claimed throughout this entire proceeding, and those are the only assets that they claim. They don't claim any surface ownership, and it was Williamson Energy's burden to prove that they own surface property, and there was no demonstration of that at the trial court. They didn't prove up that they owned any surface property, and if they don't own surface property, then the new surface clause cannot apply. Additionally, there are elements from the Illinois partnership law that prevent the new surface clause from being operable. Specifically, Williamson Energy argues that the partnership owns this property, supposedly a new surface, for the benefit of the keys. But the Mitchell-Roberts partnership is a general partnership. It is a standalone legal entity, and under the law, black letter law with Illinois Partnership Act, is that that entity owns its assets for itself. Not on behalf of the partners. The partners don't have an ownership interest in any of the real estate. They're not co-tenants or co-owners. Their only interest as partners is a personal property interest, and that's to the assets and the debts and any distributions to come from the partnership. So because those partners, because the partnership owns the property for itself and not for the partners, it doesn't fit into the category that Williamson claims that it does in the new surface clause of the mitigation agreement. It does not own it on behalf of the keys. And even if it was, excuse me, not if it was, but if you think about it also, the individual partnership share that the keys own is transferable. That's a personal property interest. They could transfer it. They could sell it. So according to Williamson Energy, this new surface clause attaches to all future acquired property, but for how long? For only as long as the keys are members of the partnership? What if they transfer that partnership interest to somebody else? Does the new surface clause still apply? Because now the land is not being held for the benefit of the keys, it's being held for the benefit of whoever they transferred it to. So what does the new surface clause do in that situation? How does that affect the real property? And that's an answer that I don't believe they can give because I don't think they thought that far ahead because I don't think that this is an operative element or agreement that is workable in the long run. And when it gets into some of the arguments that they've made, they've admitted that this is a personal property interest that the partners have. On page 42 of their brief, they stated that when the keys were signed into mitigation agreements, they were doing it in relation to partnership property. That's their position at that point in the brief, saying that the partnership owned it in 2010. Well, if the partnership owned it in 2010, then later on it's not new surface. If it's been owned by the partnership this whole time and it's owned by the partnership now, that's not new surface, that's just continued ownership. So if it's not newly acquired, then the new surface clause doesn't even apply in that particular situation because it's not new. Lastly, the impact of this decision is significant. If you're looking at what would happen with the decision under the new surface clause, by the court saying that it was applicable, the court has essentially determined that the Mitchell-Roberts partnership, which has never claimed ownership of the surface, now owns the surface of the parcels in the Pierce Feeds. That's thousands of acres of land. And now all those surface owners who are currently owning and residing on those surface parcels, they were not notified of this, they were not involved, they didn't have an opportunity to object, and yet now the court has made a judicial determination that the Mitchell-Roberts partnership owns that surface. That has far-reaching implications that I don't think were considered and that I don't think are appropriate because those individual property owners are due notice. And just on parcel 68, there are 12 individual pins and 8 to 9 separate owners. If you multiply that out by the hundreds of parcels that were included in the Pierce Feeds, you're talking about hundreds and hundreds of individuals whose property rights have been upturned by the decision of the lower court. Lastly, I will jump ahead and just cover the fact that the judicial admissions, as you indicated, Your Honor, they were not proper judicial admissions because they either were questions of law or legal conclusions or they were not within the particular knowledge of the individuals that were making them. As it related to the amendments in the first place for the amended counterclaim, the court didn't properly apply the factors that's required by law. That's an abuse of discretion, and so the amendment from the get-go is improper. And if you look at all of those separate factors and put them all together, you find that the motion for summary judgment was not properly granted. There were still issues and questions of law that needed to be determined, particularly in relation to unconscionability. We never had an opportunity to hear the testimony of the individuals who were involved to determine their credibility as it relates to whether they were under duress, whether they had a meaningful choice when they were making these decisions. Those were things that weren't decided by the court because it never gave us an opportunity to present that evidence. And additionally, never put the burden on Williams and Energy to prove up those things. We'll stand on our arguments as it relates to the attorney's fees, and I thank you for your time and ask you to reverse. Just a moment. Questions, Justice Kagan, for either counsel? Justice Schiller? No. All right. Thank you.  Mr. Hammack? Good morning, Your Honors, and may it please the Court. Counsel Joshua Hammack on behalf of Williams and Energy. We're here today now for a second time because of a lawsuit the Mitchell-Roberts Partnership instigated and insisted upon. For seven long years, Williams and Energy played defense while the partnership and its partners sought $900 million. The claims were based on a simple proposition. They said Williams and Energy's mining operations would allegedly violate the partnership's supposed subsidence rights in hundreds of parcels, including Parcel 68, conveyed in these 100-year-old pier steeds. That was the fundamental premise of their claims, of this lawsuit. They repeated that premise over and over, consistently claiming in verified allegations and in briefing and in partnership agreements that they owned Parcel 68 and more than 100 other parcels in the pier steeds. They repeatedly said the partnership had conveyed the deep coal in those parcels and kept all the remaining property interests for itself, including in Parcel 68, for more than 100 years. They couldn't have pursued their nearly billion-dollar claims without those representations. Now, as it turned out, the pier steeds unequivocally waived the very subsidence rights the partnership asserted. This Court has already unanimously rejected the partnership's tortured reading of those deeds, and that portion of the case is final. It's not part of this appeal. But the story the partnership told, all those facts the partnership insisted were true when it was on offense, remain relevant here. If an assertion is true, as the partnership and its partners have repeatedly said, including in verified allegations and testimony under oath, it is true all the time. When the partnership's on offense, sure, but when it's on defense, too. And that's relevant because years before the partnership and its partners filed this lawsuit, two partners had entered the mitigation agreements with Williamson Energy. Even though it already had the right to subside the land as the successor and interest to those 100-year-old pier steeds, Williamson Energy entered mitigation agreements that conveyed subsidence rights and waived related claims. It was a belt-and-suspenders approach. Not stylish, perhaps, in the world of high fashion, but a great way for a risk-averse business investing tens of millions of dollars into a mining operation to protect itself. And those agreements did one more relevant thing. They included attorney's fees provisions. So when the judgment on the partnership's affirmative claims went final, it was time to address Williamson Energy's counterclaims. That is, that the partnership owed Williamson Energy attorney's fees because those seven long years of litigation had concerned claims expressly waived in the mitigation agreements. At that stage, though, the partnership's remarkably consistent story, which had stretched across seven years of litigation, including in briefing to this court and to the Illinois Supreme Court and to a federal bankruptcy court, no longer served them. Once they lost the affirmative claims, the partnership suddenly wanted to change its tune. Come to think of it, maybe we didn't own all those parcels, or maybe we owned all of them except for parcel 68 conveniently. Maybe all those verified allegations and sworn testimony should just be casually disregarded. No big deal. Not surprisingly, the trial court wasn't buying the sudden change of heart. Indeed, the very point of judicial admissions and of verified allegations is to avoid this kind of legal gamesmanship, this idea that facts are one thing if I'm on offense, but an entirely different 180-degree opposite thing if I find myself playing defense, this idea that the facts can just change back and forth depending on whatever suits me best in the moment. The law does not countenance such an approach, and it should not reward it here. The partnership and the partners remain bound by the story they claimed was true for seven years. No take-backs. Williamson Energy is entitled to its reasonable fees, and it is entirely reasonable for it to have spent just under $3 million defending itself against a $900 million claim for seven years. Particularly— Counsel, let me interrupt you. Can you address the issue of the bankruptcy and its effect on standing? Absolutely, Your Honor. So let's talk first about what's not disputed here. First, the disclosure statement said the reorganized debtors would retain all rights to all causes of action, and the bankruptcy court approved that statement as having enough information for creditors to make informed decisions. The asset schedules and financial statements similarly expressly retained rights to all causes of action. The plan and the plan's supplement said the same. We expressly retained the rights to all causes of action. That's the catch-all Your Honor mentioned a little bit earlier. Well, we don't have a schedule if you can just say we reserve everything. We keep everything. Well, not quite, Your Honor. And I think the language that my colleague quoted earlier today is somewhat telling, because the problem was with quantifying it. The problem was we could not quantify it at the time in 2020 and think about why that was. In 2020, the appeal to this court was still pending. The judgment wasn't final. There was no guarantee that we really even had a counterclaim because it was kind of contingent on the success of their affirmative claims. So we couldn't say, well, here's the number that should be attached. But we did have a counterclaim, and we expressly reserved all causes of action. Now, moving forward, you have a confirmation order from the bankruptcy court. And what does that confirmation order say? Except as otherwise provided in the plan, all causes of action shall vest in each respective reorganized debtor. All causes of action. So really what they're doing is attacking, collaterally, the confirmation order, which is binding on them, just like it's binding on every other creditor and every other person. That confirmation order shouldn't really be subject to a challenge in this venue. If they meant to appeal it or they meant to set it aside, the proper venue is to go to the bankruptcy court and see what you can do there. Not here, though. So the bankruptcy court— Are you aware that the specific counterclaim was never specifically identified in any schedule or amended schedule? I think it's true, Your Honor, that the cause of action was not listed by name. But that's not a requirement of the bankruptcy code. And recall, again, that the bankruptcy court specifically held that the disclosures we made were adequate for creditors to make informed decisions. The confirmation order comes in and says all causes of action again. So it doesn't mention this cause of action precisely by name. But this cause of action, of course, is subsumed within all causes of action. Counsel, how could they challenge the confirmation order if they're not listed in the bankruptcy schedule? They participated in—sorry. If they're not listed, if the mutual partnership and the suit is not listed, how then would they challenge the confirmation order within the bankruptcy court? Help me understand that. Even now they could go file to reopen or file with the bankruptcy court to say, we need clarification about what the confirmation order— when it says all causes of action, does it really mean some narrow subset of causes of action that somehow don't include this claim? The problem is that there isn't an ambiguity. The confirmation order is unambiguous and clear that all causes of action vest back in the reorganized debtor. There is no bankruptcy estate in this case anymore. Everything has been discharged or done in the bankruptcy court. So there's just no valid reason to be here talking about, can we challenge the confirmation order that came, you know, three years ago now? That seems maybe arguable if you have some unknown or some cause of action out there that we're not really sure about. But you were aware of this cause of action, this counterclaim. We were aware of the cause of action's existence. But again, it was unquantifiable. And that's exactly what we said. We can't quantify what this counterclaim was worth. We couldn't put any dollar value on it because it still remained contingent at the time in 2020 when we were creating schedules and listing assets. It was a contingent asset potentially of no value. This Court had not yet affirmed judgment on the partnership's affirmative claims. The appellate process wasn't finished. We didn't have a final judgment there. And without that final judgment, we couldn't really litigate or express a value as to our counterclaim. Now, I also heard, Your Honors, that the 1939 agreement somehow expressly excludes Parcel 68, which is just flatly untrue. That agreement doesn't mention Parcel 68. It doesn't mention the partnership by name at all. And again, we have verified allegations. Litigation across seven years drafted those verified allegations, mind you, by sophisticated attorneys, not unsophisticated, you know, country bumpkins or something that I think that I heard counsel arguing before. These were sophisticated attorneys drafting verified allegations. And those verified allegations said the partnership did, in fact, own Parcel 68. I'd like to spend a moment on unconscionability. The relevant language here wasn't added. There wasn't an amendment. It didn't come later. It's in the same font, the same style as everything else. We're talking about a few pages of a mitigation agreement here after, by the way, months of negotiation with the keys, where they negotiated probably the most critical term of the mitigation agreements, namely the price they would be paid. And they negotiated it up from about $120,000 to about $176,000, about a 40 percent increase in the price that Williamson Energy paid, which, by the way, exceeded an appraisal Williamson Energy had done and shared with the keys. So Williamson Energy was paying a premium on top of the full value of the structures at issue for these agreements. And, by the way, remember, parties who sign agreements are charged with knowledge, are typically charged with knowledge of their terms and the conditions expressed in those agreements. The agreements themselves came with a cover letter that said they would be held open for five days. The keys had five days to think about it before they signed. They could have gone out and had an attorney review it if they wanted. Nothing prevented them from doing that. There's no claim that anyone prevented them from doing that. Of course, then after, the keys and the partnership ratified those agreements. They went to closings, the keys, in, I think, three months and five months after signing the mitigation agreements. They didn't raise any red flag then. They took their $176,000. They spent another ten years with that money operating under the assumption that everything was fine. And then finally, only after they lost on their affirmative claims, we hear for the first time, now wait a minute, the mitigation agreements are unconscionable. Five years, by the way, after we said the mitigation agreements are what prevented their affirmative claims and would entitle us to attorney's fees. So five years after we said that, we finally hear that they're unconscionable. The facts just don't bear out the claim at all. I heard counsel also argue that the partnership didn't claim any ownership interest in surface land, which is flatly untrue. Yet again, Parcel 68, of course, was obtained in fee by the partnership and the deep coal went out. They had the surface land. They had every property right except for the rights to the deep coal in that land. And that's true of other parcels throughout the Pierce thieves as well. And, of course, the partnership claimed across those seven years that it owned subsidence rights and all the relevant parcels. And subsidence rights are surface property interests. There was a complicated hypothetical about what would happen if the Keys transferred their partnership interest to a third party and then there was an acquisition after that and whose benefit would it be for? All of that is irrelevant and hypothetical. It's no reason to hold that the partnership should be free of its verified allegations or its testimony. It has no purchase here at all. And Parcel 68 itself, of course, wasn't the new surface property. I think we agree there. The Keys signed on behalf of the partnership for partnership property, Parcel 68. And then the partners entered that second partnership agreement where they conveyed all their individual interests in various pieces of land that they held in their own personal names. And all of that property in kind of one bucket was new. They expressly conveyed it and assigned all their rights and waived all their individual interests. That's the new property. That's the new piece right there. And once that happened, all the parcels covered in that second partnership agreement became subject to the mitigation agreement, namely the new surface clause, the waiver provisions, and the attorneys' fees provisions. And so for all those reasons, Your Honor, the trial court's judgment should be affirmed in full. Thank you very much. Unless there are further questions. Justice King, Justice Shulman. Thank you. Thank you. Thank you. Mr. Elkoff, who's doing the Your Honor, if I may, we're going to switch rooms. Mr. Elkoff is going to handle rebuttal that I will if the court will permit. Objection. It's fine.  Thank you. Your Honor, a couple of things I wanted to address, Your Honors, concerning standing. Counsel just made the point, well, we couldn't quantify the amount of our claim. That's why we didn't schedule it. The schedule that I read to you earlier says because such claims are unknown to the debtors and not quantifiable as the petition date, they are not listed on Schedule A, B. First of all, there are two issues there, unknown and nonquantifiable. It was known. This counterclaim was pending since 2016. I'll be darned how it could not be quantifiable. As counsel made clear multiple times during his argument, the Mitchell-Roberts partnership had been pursuing this case for seven years. Seven years. Counsel, let me interrupt you there. What about this issue that you could have made a collateral attack on the confirmation order? Your Honor, perhaps we could have, but we're not the only players in town. Standing doesn't just go to my clients. It goes to the entire creditor body. Moreover, it was safe for us to assume that since it wasn't scheduled, and this was a known cause of action, this counterclaim, it was known to them that they were waiving it. They elected not to pursue it. They expressly said, we don't know. If anything, there was fraud on the bankruptcy court. Moreover, much was made of the bankruptcy court issuing its confirmation order. That confirmation order was entered in a vacuum, that vacuum being the omission of a cause of action that would more than double the distributions to all unsecured creditors across all of the Foresight Energy debtors. So, Your Honor, standing is, in fact, a live issue. Moreover, judicial estoppel is a live issue. They didn't schedule it. Moreover, the disclosure statement that accompanies a plan of reorganization is not a proxy for schedules. That is a separate provision of the bankruptcy code. That's a Section 1125 preplanned disclosure. It's similar to a disclosure statement in connection with the issuance of securities. It's a disclosure to give you the ability to make an informed decision on the plan. But that goes hand-in-glove with the schedules. There's two different issues there, and there's nothing in Section 1125 that indicates that it is somehow a substitute for the unquestionable obligation to schedule assets and liabilities. So, number one, it certainly was quantifiable because Williamson Energy knew how much it had spent on attorney's fees since 2016 when it filed its bankruptcy case in March of 2020. The subsidence rights that were addressed apply to all strat, not just the surface, all strat. And Williamson Energy was arguing to protect its shallow coal rights, not necessarily the surface. And the 39 agreement that was discussed did exclude Parcel 68. So, Your Honor, for all those reasons, we ask that the court enter its order reversing the decision issued in the Circuit Court of Williamson County, reverse it outright as a matter of law based upon standing. Moreover, in light of the court's, and I realize it's not binding here today, but in light of the court's Rule 23 decision issued yesterday in the Chamberlain case concerning unconscionability, that decision was issued yesterday under Rule 23. I realize it's not binding, but it can't be used as persuasive authority under Rule 23e. A decision finding, in essence, that this was not unconscionable is against the manifest weight of the evidence because there ain't no evidence that Williamson Energy produced or elicited at the trial court that would support a finding that these mitigation agreements were not unconscionable. Thank you. Unless the court has any further questions, we'll rest. Let me ask you one thing. Yes, Your Honor. I don't deal with bankruptcy a whole lot in state court, but the argument that you maybe should have gone in and attacked the confirmation order, if they left something out they should have put in, what is the benefit to you to go in and say, hey, you left this out? There's no benefit to me to do that. I don't understand why you would even want to do that if that's something you could do. Well, not only that, but it's striking because what Williamson is foisting upon creditors is the obligation to police them. They're the ones with the obligation to schedule assets. We don't have an obligation to collaterally attack everything they file and alert them to the fact that they omitted an asset or what they claim to be an asset. It's their job, not the creditor's jobs. And we were, in fact, a creditor in that case, albeit a contingent creditor. But would it be appropriate, though, if they said, we have this catch-all thing, all claims and causes of action, known and unknown, would it not be to your benefit to say, are you including us in that catch-all? Or is it better to sit back and... I don't know that it would be to my benefit to say to them, hey, by the way, you missed us. I don't know that it would be to my benefit at all to say that. If they want to box themselves in and shirk their obligation under the bankruptcy code, that's their election to do so. I don't believe that a creditor has the obligation to police them and go back and attack them and say, you forgot to include this. And I might also note, Your Honor, that the question of standing has been pending before the Circuit Court, Williamson County, as you can see from the record, for close to three years now, at least over two years, not once. And they have the right. It's freely given under the bankruptcy code to go in and amend the schedules. And that was an issue in, I believe, the Cologne case that was decided last week by the First District Appellate Court. The debtor went in and amended the schedules and cured the standing problem. They had every opportunity to amend their schedules. Since the bankruptcy case was filed, since we raised the standing judicial estoppel issues, they haven't done so. Thank you. Thank you, Your Honor. Thank you for the Court's time. Thank you. We appreciate your arguments. This is, as I said at the beginning, a complicated case with a lot of record to review. We appreciate your briefs and the arguments you made today. We will take the matter under advisement and issue a decision in due course.